DENNIS, Circuit Judge,
concurring:
I join in the Court’s opinion and write separately only to set forth additional analysis in support of the Court’s conclusion.
The plaintiffs contend that Congress lacks the authority to regulate, under the ESA, activity that endangers or threatens intrastate, non-commercial species. The Court correctly upholds the challenged ESA provision as applied to such species.
One express purpose of the ESA is to provide a comprehensive program for the conservation of endangered and threatened species and the ecosystems upon which they depend. The extinction or harm of endangered or threatened species has a substantial impact upon interstate commerce because in many cases those species or products derived from them are articles of commerce. Further, their extinction or harm could have a significant deleterious effect upon interstate commerce between the states by adversely affecting the commercial intercourse of non-endangered species or their derivatives. Finally, the conservation of the ecosystems upon which these commercial species depend may require the regulation of activities harmful to non-commercial species concentrated within a single state or region. Consequently, Congress has the authority to make a rational determination to conserve such non-commercial, intrastate species as an essential or integral part of the comprehensive ESA program that regulates activities having a substantial impact on interstate commerce.
At least as early as United States v. Darby, the Supreme Court recognized that Congress has the power to regulate intrastate activities that it rationally finds necessary to regulate in order to effectuate its regulation of interstate commerce.[1] In Darby, emphasis was placed on whether the regulation was an “appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce.”[2] This approach harks back to McCulloch v. Maryland, which noted that the Constitution authorizes Congress to make “all laws which shall be necessary and proper for carrying into execution the foregoing powers.”[3] Chief Justice Marshall found that the Necessary and Proper clause accords to Congress
that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not pro *642 hibited, but consist with the letter and spirit of the constitution, are constitutional.[4]
Darby also pointed out that the Court had often sustained legislation enacted under powers other than the Commerce Clause, “when the means chosen, although not themselves within the granted power, were nevertheless deemed appropriate aids to the accomplishment of some purpose within an admitted power of the national government.”[5] A similar approach had been used in cases applying the Commerce Clause to intrastate activities “when the intrastate transactions were so commingled with or related to interstate commerce as to demand that all be regulated if the interstate commerce were to be effectively controlled.”[6]
Indeed, the Supreme Court’s cases, from Darby to the present, confirm that Congress has the authority under the Constitution, through the intersection of the Commerce Clause and the Necessary and Proper Clause, to regulate an intrastate activity that it could not reach standing alone, if the regulation is essential or integral to the maintenance of a larger regulatory scheme properly governing interstate commerce.[7] This rule has recently been designated by one scholar as the “comprehensive scheme” principle.[8] This Court *643 and its judges have, in effect, recognized the principle by concluding that both commercial and noncommercial activity may be regulated by Congress if the regulation is an essential or integral part of a larger comprehensive scheme properly regulating activity substantially affecting interstate commerce.[9]
The free-standing statutes at issue in Lopez and United States v. Morrison[10] addressed intrastate offenses of the kind that have been traditionally dealt with by state legislation. Neither statute was an integral or ancillary part of a comprehensive scheme reasonably designed to regulate activity having a substantial effect on interstate commerce. In Lopez the Court held that the Gun-Free School Zones Act, which made it a federal offense to knowingly possess a firearm in a known or reasonably recognizable school zone, exceeded Congress’ commerce clause authority because the criminalized conduct was not an economic activity that substantially affected interstate commerce. The Court expressly noted that the statute was not an essential part of a larger regulation of economic activity, in which the regulatory scheme would be undercut unless the intrastate activity were regulated.[11] Similarly, in Morrison the Court held that the Commerce Clause does not authorize Congress to enact a federal civil remedy for the victims of gender-motivated violence. The Court stated that gender-motivated crimes of violence are not economic activity substantially affecting interstate commerce.[12]
In this case, by contrast, the prohibition of the Cave Species takes is integral to achieving Congress’s rational purpose in enacting the ESA. In particular, the ESA regulates interstate commerce by attempting to prevent the extinction of both commercial and non-commercial species. Regulations under the ESA therefore significantly affect the nation’s economy and welfare. Non-commercial species are in many instances vital to the survival of ecosystems upon which commercial species *644 are dependent. The interrelationship of commercial and non-commercial species is so complicated, intertwined, and not yet fully understood that Congress acted rationally in seeking to protect all endangered or threatened species from extinction or harm. The ESA is a necessary and proper means not only to conserve the nation’s valuable biological resources, but also to promote interstate commerce involving those resources. While some states, including Texas, have taken steps to protect species against extinction, the threat of extinction of species and loss of their habitat is both a worldwide and a national problem that requires at least a comprehensive national solution. Furthermore, as the Congress recognized, some of the presently covered non-commercial species will prove to be of “incalculable” future value to the nation and its economy because they are sources of genetic, scientific, and biomedical research and development that will likely facilitate the production of commercial goods, services, and techniques.
Thus, as the opinion states, the constitutionality of the FWS’s regulation of the Cave Species takes does not depend on aggregating the effects of all takes of endangered species in order to arrive at a sum effect on interstate commerce that is, post-aggregation, substantial. Put another way, the constitutionality of any particular application of the ESA take provision does not depend on adding up “a large number of small but definite [economic] impacts from each insect or plant of an endangered species” to reach a substantial effect on interstate commerce.[13] Rather, the FWS can prohibit the Cave Species takes because such regulation is essential to the efficacy of — that is, the regulation is necessary and proper to — the ESA’s comprehensive scheme to preserve the nation’s genetic heritage and the “incalculable” value inherent to that scarce natural resource, and because that regulatory scheme has a very substantial impact on interstate commerce.

.312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609 (1941).

. Id. at 118, 61 S.Ct. 451.

. 4 Wheat. 316, 17 U.S. 316, 411-12, 4 L.Ed. 579 (1819) (quoting U.S. Const, art. I, § 8, cl. 18); see Robert L. Stern, The Commerce Clause and the National Economy, 1933-1946, 59 Harv. L. Rev. 883, 890 (1946).

. McCulloch, 17 U.S. at 421.

. Darby, 312 U.S. at 121, 61 S.Ct. 451 (citing Jacob Ruppert, Inc. v. Caffey, 251 U.S. 264, 40 S.Ct. 141, 64 L.Ed. 260 (1920); James Everard’s Breweries v. Day, 265 U.S. 545, 560, 44 S.Ct. 628, 68 L.Ed. 1174 (1924); Westfall v. United States, 274 U.S. 256, 259, 47 S.Ct. 629, 71 L.Ed. 1036 (1927)).

. Stern, The Commerce Clause, 59 Harv. L. Rev. at 891 (citing Houston, E. & W. Tex. Ry. Co. v. United States, 234 U.S. 342, 34 S.Ct. 833, 58 L.Ed. 1341 (1914) (Shreveport Rate Cases); Railroad Comm’n of Wis. v. Chicago Burlington & Quincy Ry. Co., 257 U.S. 563, 42 S.Ct. 232, 66 L.Ed. 371 (1922); Southern Ry. Co. v. United States, 222 U.S. 20, 32 S.Ct. 2, 56 L.Ed. 72 (1911); Baltimore & Ohio Ry. Co. v. ICC, 221 U.S. 612, 31 S.Ct. 621, 55 L.Ed. 878 (1911)).

. See, e.g., United States v. Lopez, 514 U.S. 549, 561, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (finding that the regulation of gun possession near schools under the Gun-Free School Zones Act was "not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated”); Hodel v. Indiana, 452 U.S. 314, 329 n. 17, 101 S.Ct. 2376, 69 L.Ed.2d 40 (1981) ("A complex regulatory program ... can survive a Commerce Clause challenge without showing that every single facet of the program is independently and directly related to a valid congressional goal. It is enough that the challenged provisions are an integral part of the regulatory program and that the regulatory scheme when considered as a whole satisfies [the substantial effect] test.”); Maryland v. Wirtz, 392 U.S. 183, 192-93, 88 S.Ct. 2017, 20 L.Ed.2d 1020 (1968) (refusing to "excise, as trivial, individual instances” of regulation because the effect of such excision would be to undermine the effectiveness of the regulatory program); United States v. Wrightwood Dairy Co., 315 U.S. 110, 121, 62 S.Ct. 523, 86 L.Ed. 726 (1942) (stating that Congress has the power to enact such regulations of intrastate activity as are "necessary and appropriate” to make the regulation of interstate commerce effective); Darby, 312 U.S. at 118, 61 S.Ct. 451 ("[Congress’s power] extends to those activities intrastate which so affect interstate commerce or the exercise of the power of Congress over it as to make regulation of them appropriate means to the attainment of a legitimate end, the exercise of the granted power of Congress to regulate interstate commerce.”); NLRB v. Jones & Laughlin Steel Corporation, 301 U.S. 1, 36, 57 S.Ct. 615, 81 L.Ed. 893 (1937) (“The congressional authority to protect interstate commerce from burdens and obstructions is not limited to transactions which can be deemed to be an essential part of a ‘flow’ of interstate or foreign commerce.”).

.See Adrian Vermeule, Does Commerce Clause Review Have Perverse Effects? 46 Vill. L. Rev. 1325 (2001); Adrian Vermeule, Centralization and the Commerce Clause, 31 Envtl. L. Rep. 11334 (2001).

.See Groome Resources Ltd. v. Parish of Jefferson, 234 F.3d 192, 205 (5th Cir.2000) (''[A] close reading of Lopez ... provides two recognized and historically rooted means of congressional regulation under the commerce power: (1) whether the activity is ‘any sort of economic enterprise, however broadly one might define those terms’; or (2) whether the activity exists as 'an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.’ ” (quoting Lopez, 514 U.S. at 561, 115 S.Ct. 1624)); United States v. Bird, 124 F.3d 667, 675 (5th Cir.1997) ("As a federal criminal statute regulating intrastate noncommercial conduct, [the challenged section of the Freedom of Access to Clinic Entrances Act] must be justified, if at all, as ‘an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated.' ” (quoting Lopez, 514 U.S. at 561, 115 S.Ct. 1624)); see also United States v. Hickman, 179 F.3d 230, 231 (5th Cir.1999) (en banc) (Higginbotham, J., dissenting) ("Congress may protect, enhance, or restrict some particular interstate economic market, such as those in wheat, credit, minority travel, abortion service, illegal drugs, and the like, and Congress may regulate intrastate activity as part of a broader scheme.”); United States v. Kirk, 105 F.3d 997, 1014 (5th Cir.1997) (en banc) (Jones, J., dissenting) (stating that the most critical consideration in determining the constitutionality of a statute prohibiting certain possessions of machine guns is whether it "fulfills the mission of regulating interstate commerce as (1) a regulation of economic activity which, although itself local, has substantial effect on interstate commerce, or (2) a regulation of activity which is essential to maintaining a larger, interstate regime of economic activity.”).

. United States v. Morrison, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000).

. Lopez, 514 U.S. at 561, 115 S.Ct. 1624.

. Morrison, 529 U.S. at 613, 120 S.Ct. 1740.

. Charles Tiefer, After Morrison, Can Congress Preserve Environmental Laws from Commerce Clause Challenge? 30 Envt’l L. Rep. 10888 (2000).